**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|   |   |   |
|---|---|---|
| DENISE FARINA, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:09-CV-49 (JCH) |
|   | : |   |
| v. | : |   |
|   | : |   |
| BRANFORD BOARD OF | : | SEPTEMBER 22, 2010 |
| EDUCATION, ET AL., | : |   |
| Defendants. | : |   |

**RULING RE: MOTION FOR SUMMARY JUDGMENT (Doc. No. 57)**

## I.   INTRODUCTION

Plaintiff Denise Farina ("Farina") brings this action against her former employer, the Branford Board of Education (hereinafter "the Board"); Anthony Buono ("Buono"), the principal at the school at which Farina taught; Monica Briggs ("Briggs"), the assistant principal; and Kathleen Halligan ("Halligan"), Branford's Superintendent of Schools. Farina's Third Amended Complaint, which is the operative complaint for purposes of this Ruling, contains eleven counts. Counts One and Two allege violations of the Age Discrimination in Employment Act of 1967 ("the ADEA"), 29 U.S.C. § 621 <u>et seq.</u>, against the Board. Counts Three, Four, Five, and Eleven charge the Board with violations of the Americans with Disabilities Act ("the ADA"), 42 U.S.C. § 12101 <u>et seq.</u> Counts Six and Ten allege that the Board violated the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-58 <u>et seq.</u>, and Counts Seven and Eight charge Buono, Briggs, and Halligan with violations of that statute. Count Nine alleges intentional infliction of emotional distress against Buono, Briggs, and Halligan, under Connecticut law. The defendants now move for summary judgment on all of Farina's

1

claims.  For the following reasons, the Motion for Summary Judgment (Doc. No. 57) is granted.

## II.     STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Fed R. Civ. P. 56(c); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (stating that a non-moving party must point to more than a mere "scintilla" of

2

evidence in order to defeat a motion for summary judgment) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

## III.    FACTUAL BACKGROUND[1]

### A.    <u>Farina's Employment and Termination</u>

Farina was a tenured teacher employed by the Board from September 1, 1982, until November 18, 2009.  L.R. 56(a)(1) Stmt. at ¶ 1.  Until the 2006-2007 school year, she taught kindergarten at Mary T. Murphy School.  <u>See, e.g.</u>, <u>id.</u> at ¶ 3; Third Am. Compl. at ¶ 22.  During the 2003-2004 school year, the principal of that school, Kathryn Sassu ("Sassu"),[2] first raised "formal concerns" about Farina's performance as a teacher, sharply criticizing her in an evaluative document entitled "Teacher Assessment Instrument Form A."[3]  L.R. 56(a)(1) Stmt. at ¶ 5; <u>see also</u> Buono Dep. at 20:18-20.  In that evaluation, Sassu wrote, <u>inter alia</u>, that Farina was apparently unaware of "current developments in instruction," that "very little interaction between teacher and student is observable," that her lessons lacked organization, that her lessons plans lacked substance, and that she "seem[ed] to be ineffective in helping students to develop efficient habits and learning stategies."  <u>See</u> Defs.' Exh. 3; <u>see also</u> L.R. 56(a)(1) Stmt.

---

[1] For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving plaintiff, where there is evidence to support her allegations.

[2] Sassu is not a party to this lawsuit.

[3] Farina denies the assertions contained in paragraphs 6-24 of the Local Rule 56(a)(1) Statement, which discuss concerns about Farina's teaching that were raised during the 2003-2004 school year. Farina's denials, however, do not contain any specific citation to the record, and instead reference the fact that she does not believe defendants' Exhibit 2 should be admissible as evidence.  <u>See</u> L.R. 56(a)(2) Stmt. at 1-2, ¶¶ 6- 24.  The defendants, however, do not cite Exhibit 2 in support of any of paragraphs 6-24 of their Local Rule 56(a)(1) Statement.  The facts contained in those paragraphs are therefore "deemed admitted," to the extent that there is evidence in the record to support them.  D. Conn. L. Civ. R. 56(a)(1).

at ¶¶ 6-24; infra section IV.C.1.b (discussing Farina's objections to this evaluation as based on "hearsay").

Buono replaced Sassu as the principal of Murphy during the 2004-2005 school year. L.R. 56(a)(1) Stmt. at ¶ 27. During that year, Vice Principal Michael Iovanna ("Iovanna") observed Farina nine times and rendered his own evaluation. Id. at ¶ 28.[4] That evaluation stated that Farina was currently placed in, or should be placed in, the "summative cluster," a designation reserved for teachers "identified for intensive intervention" as "a consequence of an unfavorable evaluation."[5] L.R. 56(a)(1) Stmt. at ¶¶ 30, 32.

At some point, Buono decided that Farina "should be placed on a Performance Improvement Plan for the 2005-2006 school year." Id. at ¶ 33. Farina was placed on such a plan, and the Board subsequently provided Farina with "[e]xtensive support," including the assistance of a reading specialist and instructional coach. Id. at ¶ 34.[6] At

_____

[4] Paragraph 28 of the Local Rule 56(a)(1) Statement cites Defendants' Exhibit 5. Farina denies paragraph 28, stating that "9 [e]valuations [were] never produced outside of this one exhibit." However, Exhibit 5 clearly indicates that Iovanna performed a total of 9 observations during the evaluation period. See Defs.' Exh. 5. Because Farina has not cited to any evidence indicating that Iovanna did not observe her 9 times over the 2004-2005 school year, the fact contained in paragraph 28 of the Local Rule 56(a)(1) statement is "deemed admitted."
    While the defendants contend that Iovanna's review was equally unfavorable as Sassu's review from the year before, the court disagrees. See Defs.' Exh. 5. If nothing else, Iovanna's evaluation was considerably less detailed than Sassu's, stating, inter alia, that Farina "encourages students and makes efforts to help them succeed," but also "needs to take the role of the leader in the classroom." Id.

[5] The evidence Farina cites plausibly indicates that she was already in the summative cluster at the time Iovanna rendered her evaluation. See Buono Dep. at 20:13-17 (indicating that Sassu placed Farina in the summative cluster). The record is unclear whether Farina was re-placed in the summative cluster as a result of Iovanna's evaluation, or whether that evaluation simply indicates that she had previously been placed in that cluster. See Defs.' Exh. 5.

[6] To the extent paragraph 34 of the Local Rule 56(a)(1) Statement cites Defendants' Exhibit 2, the court will disregard that evidence on Farina's objection. However, paragraph 34 also cites Defendants' Exhibit 8. To the extent the statement of fact contained in paragraph 34 is supported by Exhibit 8, it is "deemed admitted."

4

the end of the school year, Buono submitted an evaluation of Farina indicating that her teaching had improved.  Id. at ¶ 35;[7] Defs.' Exh. 9.  After that school year, a position became available in the fourth grade, and Farina "happily accepted it."  L.R. 56(a)(1) Stmt. at ¶¶ 36, 37.

To help her with the transition to the fourth grade, the Board provided Farina with various forms of assistance, including professional development training and help from an instructional coach.  Id. at ¶ 38.[8]  Notwithstanding that aid, Farina's students—unlike the students in the classes of other fourth grade teachers—made no progress in the reading portion of the Connecticut Mastery Test, as compared with the students who had been fourth graders the year before.[9]  Defs.' Exh. 12.  Moreover, when the school year was over, Buono issued an evaluation indicating that she had been tardy "on more than a dozen occasions" over the term.  Defs.' Exh. 14.

Farina was consequently placed in a "Teacher Improvement Planning Phase"

---

[7] Paragraph 35 of the Local Rule 56(a)(2) Statement cites Plaintiff's Exhibit 6, which is Iovanna's evaluation from the end of the 2004-2005 school year.  Because that evidence does not relate to any evaluations produced in the 2005-2006 school year, paragraph 35 of the Local Rule 56(a)(1) Statement is "deemed admitted."

[8] To the extent paragraph 38 of the Local Rule 56(a)(1) Statement cites defendants' Exhibit 2, the court will disregard that evidence.  However, paragraph 38 also cites defendants' Exhibit 10. To the extent it is supported by Exhibit 10, paragraph 38 is "deemed admitted."
The court further notes that Farina's denial of Local Rule 56(a)(1) Statement at ¶ 38 cites her own deposition at pages 66 and 68.  Those pages, however, were not provided to the court by either party and are thus not in the record.

[9] Farina disputes this allegation.  However, the citations she provides do not contradict the fact in question.  The portions of Farina's deposition cited merely indicate her belief that the defendants may have placed the weakest fourth graders in her class on purpose and that her class contained more non-native English speakers than the other fourth grade classes.  See Farina Dep. at 98:17-99:25.

("TIPP") for the 2007-2008 school year.[10]  L.R. 56(a)(1) Stmt. at ¶ 42.  As part of the

TIPP, the Board laid out various areas of concern for Farina, including punctuality to

school, "plan[ning] and execut[ing] daily reading instruction to meet curricular goals,"

and better managing her classroom time.  Farina, however, received performance

reviews indicating these same concerns throughout the fall of 2007.  Pl.'s Exh. 18;

Defs.' Exhs. 15-19; L.R. 56(a)(1) Stmt. at ¶ 43.[11]  On January 25, 2008, therefore, the

TIPP was extended through April of 2008 ("the second TIPP").  L.R. 56(a)(1) Stmt. at ¶

45.[12]

On April 14, 2008, Buono wrote a letter to Farina, informing her that he would be

recommending to Halligan that her employment be terminated due to continued poor

performance reviews and tardiness.  Id. at ¶ 52.  That letter indicated that, since the

inception of the second TIPP on January 25, 2008, Farina had been tardy to work on

forty-seven percent of school days.  Defs.' Exh. 37.  Halligan thereafter sent a letter to

Farina.  Defs.' Exh. 38.   While Halligan did not terminate Farina's employment then,

she informed Farina that the TIPP would continue into the 2008-2009 school year and

that, if Farina did not make significant improvements in the areas of tardiness and

---

[10] "A tenured teacher whose performance [in specified areas]. . . is unsatisfactory may be placed in the Teacher Improvement Planning Phase (TIPP) by the administration.  TIPP removes the teacher from the normal assessment cycle.  The teacher is requested to complete an action plan and may include additional observations designed to address the identified deficiencies.  Every effort will be made to maintain confidentiality throughout this process."  Defs.' Exh. 6 at 11 (describing TIPP-related policies).

[11] It is not clear at all which portions of paragraph 43 of the Local Rule 56(a)(1) Statement Farina admits, and which portions she denies.  Paragraph 43 is thus "deemed admitted," to the extent it is not controverted by Pl.'s Exh. 18, which is cited in paragraph 43 of the Local Rule 56(a)(2) Statement.

[12] The evidence cited by Farina in her admission/denial of paragraph 45 of the Local Rule 56(a)(1) Statement does not contradict the fact in issue.  See Farina Dep. at 133:17-35.  That fact, therefore, is "deemed admitted."

effective teaching, her employment would be terminated.  See id.; L.R. 56(a)(1) Stmt. at ¶ 54.  Despite Halligan's letter, Farina's "tardiness and teaching difficulties continued throughout the remainder of the [2007-2008] school year."[13]  Id. at ¶ 57.

Around June of 2008, Buono decided to transfer Farina to the second grade.  At the time, Farina believed that this transfer would result in a "new set . . . of potential problems."  Farina Dep. at 185:12-16.  Farina, however, did not vocalize any opposition to the transfer.  Id. at 197:21-198:1.  Around the same time, on May 16, 2008, Farina filed her first complaint with the Connecticut Commission on Human Rights ("the CHRO") alleging, inter alia, age and disability discrimination.  L.R. 56(a)(1) Stmt. at ¶ 56.

Early in the 2008-2009 school year, Buono sent Farina a memorandum indicating a desire to meet with her and discuss her TIPP for that year.  Id. at ¶ 60.[14] The TIPP outlined various areas of concern, including, inter alia, that Farina was late to school thirty-seven percent of the time, that her teaching performance had not improved, and that eighty-five percent of students either "dropped at least one level or scored below basic" on the reading section of the Connecticut Mastery Test.  Id. at ¶ 61.  Also around that time, Buono sent a memorandum to Farina indicating that her classroom was organized so as to "have created safety issues."  Defs.' Exh. 56.  The

---

[13] Farina denies this assertion.  However, the evidence she cites does not contradict the fact in issue.  See Pl.'s Exhs. 12, 13, 14, 15, 20, 22.  That evidence consists of a doctor's note, documents from the 2006-2007 school year, what appear to be Board personnel policies, an article from the New Haven Independent newspaper, a letter from Farina's attorney to the Board, and Farina's CHRO complaint.  Such evidence could not form the basis for a reasonable jury to find that Farina's tardiness and teaching difficulties did not continue through the remainder of the 2007-2008 school year.

[14] Paragraph 60 of the Local Rule 56(a)(2) Statement denies paragraph 60 of the Local Rule 56(a)(1) Statement, but does not cite any evidence.  Because paragraph 60 of the Local Rule 56(a)(1) Statement is supported by the evidence cited by the defendants, it is "deemed admitted."

memorandum stated that the classroom, which contained unpacked boxes and an "arrangement of furniture" that Buono believed was unsafe, was "not conducive to teaching and learning."  Id.  Briggs expressed similar concerns in a letter dated September 8, 2008.  L.R. 56(a)(1) Stmt. at ¶ 67.[15]  On September 9, 2008, and September 11, 2008, Farina sent emails to Buono and Halligan, among others, indicating why she did not move the boxes in her classroom.  Pl.'s Exhs. 42, 43.  Farina stated, inter alia, that she had requested help in organizing her classroom, but that her requests had gone unheeded; that she did not have time to unpack her classroom because she was at school "late every day just trying to do the required things for the next day"; and that she would have been able to unpack at least some of the boxes, but for the defendants having "given away" her "rolling book cart."  Id.  One of those emails also mentioned that Farina had had multiple back surgeries in the past and therefore had difficulty moving "furniture, desks, [and] file cabinets."  Pl.'s Exh. 42.  Briggs and Buono, apparently viewing Farina's refusal to organize her classroom as insubordination, sent Farina additional letters; Buono's warned Farina that he was reporting her to Halligan.  L.R. 56(a)(1) Stmt. at ¶ 70.  A hearing was held on the issue, and Farina was ultimately suspended without pay for one workday.  Id. at ¶ 73.

Throughout the fall of 2008, Farina continued to receive performance reviews indicating the same concerns as in years past.  Id. at ¶ 75.[16]  On January 29, 2008,

---

[15] The only citation in paragraph 67 of the Local Rule 56(a)(1) Statement is to Defendants' Exhibit 57.  Because the corresponding paragraph of the Local Rule 56(a)(2) Statement refers only to Farina's objection to the admissibility of defendants' Exhibit 2, paragraph 67 is "deemed admitted."

[16] Paragraph 75 of the Local Rule 56(a)(2) Statement denies the corresponding paragraph in the Local Rule 56(a)(1) Statement, but does not cite any evidence.  Because paragraph 75 of the Local Rule 56(a)(1) Statement is supported by the evidence cited by the defendants, it is "deemed admitted."

Buono sent her a letter indicating, <u>inter alia</u>, that she had been late to work approximately sixty percent of the time that school year and that she had "not been providing [her] students with adequate instruction." Defs.' Exh. 87.

On April 2, 2009, Farina filed another CHRO complaint, alleging, <u>inter alia</u>, age and disability discrimination. <u>Id.</u> at ¶ 85. At around the same time, Farina was placed on a fourth TIPP. L.R. 56(a)(1) Stmt. at ¶¶ 81, 82. During this TIPP, Farina was evaluated by Dr. Mary Peraro, who had not before evaluated Farina's job performance; Dr. Peraro "observed the same shortcomings in [Farina's] teaching as had Ms. Briggs and Mr. Buono." <u>Id.</u> at ¶ 87. At the end of the school year, in part based on Dr. Peraro's recommendation, Halligan recommended that Farina's employment as a teacher be terminated. <u>Id.</u> at ¶ 89.

Thereafter, Farina was placed on paid administrative leave, pending the outcome of a hearing. <u>Id.</u> at ¶ 90. Ultimately, the Board, "[f]inding that [Farina] had performance issues providing just cause for termination, unanimously voted to terminate [her] employment on November 18, 2009." <u>Id.</u> at ¶ 95.

B.    <u>The Events of June 3, 2008</u>

On the morning of June 3, 2008, Farina called her school and spoke to the secretary, Judy Johnson ("Johnson"). Aff. of Judy Johnson at ¶ 3. Farina, who was crying at the time, explained to Johnson that "her dog was loose in the woods." <u>Id.</u> at ¶ 5. Farina then stated "in an off hand manner" that she "was going to be on time . . . and could just kill herself." <u>Id.</u> at ¶ 6. While Johnson did not believe that Farina was making a credible threat of suicide, she nevertheless reported to Buono what Farina had told her. <u>Id.</u> at ¶¶ 8, 9. Buono then relayed that information to Branford Police Detective

Ronald Washington, who, along with Officer James Johnson, responded to Buono's call. Buono Dep. at 184:3-8; L.R. 56(a)(1) Stmt. at ¶ 101. While Washington's police report notes that Farina told him that she did not intend to threaten suicide, the report indicates a recommendation that she be evaluated at Yale New Haven Hospital. <u>See</u> Defs' Exh. 100 (hospital abbreviated as "YNHH"). No school or Board administrators "encouraged or requested that Detective Washington take [Farina] to YNHH or be removed from the premises." L.R. 56(a)(1) Stmt. at ¶ 103.[17] Rather, it was Washington who made the decision to take Farina to the hospital. <u>Id.</u> at ¶ 104. Farina was placed in Washington's unmarked police car, transported to an ambulance waiting down the street, and then taken to the hospital. <u>Id.</u> at ¶¶ 105, 106. Farina was thereafter placed on paid sick leave. Defs.' Exh. 103. While she was quickly released from the hospital, Halligan informed her two days later that she would need to submit to another "comprehensive psychological/psychiatric evaluation" in order to return to work. <u>Id.</u> Farina returned to work the next week. L.R. 56(a)(1) Stmt. at ¶ 108.

  C. <u>Farina's Medical History</u>

   In 1988 and 1994, Farina had back surgeries for herniated and ruptured discs. <u>Id.</u> at ¶ 109. Immediately after the 1994 surgery, she was restricted from lifting items weighing more than fifteen pounds. <u>Id.</u> at ¶ 110. However, she returned to work after both surgeries and never raised the issue of her back problems with the Board until

---

[17] While Farina denies paragraph 103 of the Local Rule 56(a)(1) Statement, the evidence to which she cites, which is a letter dated June 5, 2008 (two days after Washington took Farina to the hospital), does not contradict the fact that no one encouraged Washington to take Farina to the hospital on June 3, 2008. <u>See</u> Pl.'s Exh. 38.

September 2008.  Id. at ¶¶ 114, 115.[18]

Farina was diagnosed with thyroid cancer in May 2004 and had her thyroid removed the next month.  Id. at ¶¶ 116, 117.  Once a year for five years after that surgery, Farina "underwent radioactive iodine treatment."  Id. at ¶ 118.  She has since been cancer free, but continues to take thyroid replacement medication.  Id. at ¶¶ 119, 120.  On June 5, 2008, the doctor caring for Farina's thyroid condition wrote a letter suggesting that Farina's employer allow her to come into work five to ten minutes later than is required, due to trouble with insomnia and fatigue.  Defs.' Exh. 111.  Thereafter, the Board agreed to allow Farina come to work at 8:20, instead of 8:15, which is when work ordinarily starts for teachers.  L.R. 56(a)(1) Stmt. at ¶ 135.

## IV.  DISCUSSION

### A.  Count One: ADEA Age Discrimination

Count One of the Amended Complaint alleges age discrimination, in violation of the ADEA.  The ADEA prohibits employers from taking an adverse action against an employee "because of such individual's age."  29 U.S.C. § 623(a).  In a recent case, Gross v. FBL Fin. Servs., 129 S.Ct. 2343 (2009), the Supreme Court held that, in order to prevail on an ADEA age discrimination claim, a plaintiff must establish that age was the "but for" cause of her termination.  See id. at 2352.  Unlike under other discrimination statutes, therefore, Farina cannot carry her burden of proof under the ADEA by establishing a mixed-motive for her firing.  Id. at 2350.

---

[18] Farina denies paragraphs 114 and 115 of the Local Rule 56(a)(1) Statement, but the evidence she cites does not contradict the fact in issue.  While the evidence Farina cites consists of deposition testimony describing her injuries and restrictions, it does not indicate that her employers were ever aware of the same.  See Farina Dep. at 14:8-19; 43:19-25; 44:1-6.  The facts contained in paragraphs 114 and 115 of the Local Rule 56(a)(1) Statement are therefore "deemed admitted."

Notwithstanding the Supreme Court's decision in Gross, the Second Circuit has recently clarified that courts should continue to analyze ADEA age discrimination claims using the familiar burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 105 (2d Cir. 2010) ("[W]e remain bound by, and indeed see no reason to jettison, the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit."); cf. Gross, 129 S.Ct. at 2349 n.2 (stating that the Supreme Court "has not definitively decided whether the evidentiary framework of McDonnell Douglas . . . is appropriate in the ADEA context"). Under that burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination. Gorzynski, 596 F.3d at 106. If she does, the employer must articulate a legitimate non-discriminatory reason for its action. Id. If the employer provides such a reason, the plaintiff can still prevail if she shows that the employer's proffered reason is a pretext. Id.

To establish a prima facie case of age discrimination under the ADEA, Farina must show that "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." Id. at 107. As the Second Circuit has stated, the burden on a plaintiff seeking to establish a prima facie case of ADEA age discrimination "is not a heavy

one." Id.  The court concludes that Farina has met that burden.[19]  First, the defendants

do not appear to challenge that she was over forty years old, was fired, and was then

replaced by a woman in her twenties.  Second, while there is a serious question as to

whether Farina has come forward with sufficient evidence to meet the even light prima

facie showing that she was qualified to be a teacher, the court will assume, for

purposes of the ADEA claim, that this element of the prima facie case is satisfied.  Cf.

id., 596 F.3d at 107 (stating that plaintiff had met her burden of establishing an ADEA

prima facie case, where the plaintiff "was over forty years old, was undisputedly

qualified for her position, was fired, and was then replaced by a woman in her

twenties").

　　　　Similarly, there is no dispute that the Board has shown a legitimate,

nondiscriminatory reason for Farina's discharge.  It points to, inter alia, evidence that

Farina was late for work on an unusually large number of school days and received

poor performance reviews.  See supra section III.

　　　　The court concludes, however, that Farina has not presented sufficient evidence

on which a reasonable jury could find that the Board's proffered reason for her

termination was a pretext for age discrimination.  The main piece of relevant evidence

Farina has as to the claim of pretext is the fact that she was replaced by a teacher in

her twenties.  Mem. in Opp. at 31; Aff. of Denise Farina at ¶ 43.  While the court agrees

that the Board's hiring of a replacement employee significantly younger than Farina, in

---

[19] Indeed, it appears that the defendants concede that she meets this burden.  In their discussion
of Farina's ADEA age discrimination claim, the defendants do not address the McDonnell-Douglas case elements
of the McDonnell-Douglas analysis and move straight to the issue of whether Farina has produced
evidence on which a jury could find that the proffered reason for her termination was a pretext.  See Mem.
in Supp. at 26.

combination with other evidence, might indicate age discrimination,[20] such evidence alone is not enough on which a reasonable jury could find that the Board's nondiscriminatory reason for terminating her employment was pretextual.[21] See, e.g., Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 317 (2d Cir. 1999) (finding that evidence that plaintiff was replaced by a substantially younger employee, while sufficient to meet "her de minimis burden of establishing a prima facie case of age discrimination," was insufficient to show pretext, where the record contained no other evidence that the defendant "considered [plaintiff's] age, [the younger employee's] age, or their ages relative to each other," in terminating the plaintiff's employment).

To the extent Farina argues that the Board's desire to cut costs led to her termination, such argument does not bear on whether she was terminated on the basis of her age. While Farina argues that older employees make more money than younger ones, Mem. in Opp. at 31, the Second Circuit has held that an employer's desire to cut costs is not prohibited by the ADEA, even if those who happened to be fired as a result are older employees.[22] See Criley v. Delta Air Lines, Inc., 119 F.3d 102, 105 (2d Cir.

---

[20] Indeed, as stated above, this evidence is sufficient to satisfy Farina's minimal burden as to the fourth element of her prima facie case.

[21] L.R. 56(a)(2) Statement at paragraph 2 denies the defendants' assertion that "[n]either Dr. Halligan, Mr. Buono nor Ms. Briggs ever made any comment to the plaintiff about her age or engaged in any conduct that would lead her to believe that they had any animus towards older employees." However, the evidence Farina cites does not contradict the fact in issue. See Farina Dep. at 153-154. Moreover, in other parts of Farina's deposition, she made clear that neither Buono nor Briggs had ever made any comment to her about her age, and that neither of them had "ever engaged in any employment practices" that led her "to conclude that they were [sic] animus towards older employees." See Farina Dep. at 133:15-134:1.

[22] On April 23, 2008, Dr. Halligan sent a letter "that requested that teachers inform" her of their intention to resign. Mem. in Opp. at 31. While Farina claims that this letter "was part of a plan to terminate [her] due to her age and her tenure status," id., this claim is simply implausible. Indeed, Farina has admitted that the letter was sent to all Board employees and offered a "voluntary retirement incentive." L.R. 56(a)(1) Stmt. at ¶ 55; L.R. 56(a)(2) Stmt. at ¶ 55.

1997) ("Under <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 611-12 (1993), an employer's concern about the economic consequences of employment decisions does not constitute age discrimination under the ADEA, even though there may be a correlation with age. <u>Hazen</u> made clear that employment decisions driven by factors that are empirically intertwined with age are not discriminatory so long as they are motivated by some feature other than the employee's age." (internal quotation marks and citation omitted)).

Given the lack of evidence in the record on which a reasonable jury could find that the defendants' nondiscriminatory reasons for Farina's termination were a pretext for age discrimination, summary judgment is granted to the defendants on Count One.

B.    Count Two: ADEA Harassment and Retaliation[23]

Count Two of the Amended Complaint alleges that Farina was "discriminated against, singled out, harassed and retaliated against due to [her] refusal to resign from her teaching position," in violation of the ADEA. Third Am. Compl. at ¶ 173. As with Count One, Farina must show that age was the "but for" cause for the harassment and retaliation to which she was subject, in order to prevail on this claim. <u>See</u> <u>Gorzynski</u>, 596 F.3d at 111 ("The analysis for the remainder of the burden-shifting test for the

_____

[23] The defendants assert that the claim of retaliation in Count Two is brought as to all of the individual defendants in this case, as well as the Board. Mem. in Supp. at 31. The court disagrees with this construction: Count Two is clearly entitled "RETALIATION-VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA) AGAINST BRANFORD BOARD OF EDUCATION." Third Am. Compl. at ¶ 22.
      However, to the extent Farina intended to bring ADEA claims against the individual defendants in this case, summary judgment is granted as to those defendants. <u>Martin v. Chemical Bank</u>, Nos. 95-9015, 96-9365, 129 F.3d 114, 1997 WL 701359 (Table), at * 3 (2d Cir. Nov. 10, 1997) ("[I]ndividual supervisors may not be held personally liable under the ADEA.") (citing <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1317 (2d Cir.1995) (holding, in the Title VII context, that an individual defendant may not be held individually liable), <u>abrogated on other grounds by</u> <u>Burlington Indus. v. Ellerth</u>, 524 U.S. 742 (1998)).

retaliation claims is similar to that of the age discrimination claim discussed above.");

Saunders v. N.Y.C. Dep't of Educ., No. 07 CV 2725, 2010 WL 2816321, at *25 n.15

(E.D.N.Y. July 15, 2010) ("Although the [Gross] 'but-for' analysis was rendered in the

context of an age discrimination claim, in Gorzynski, the Second Circuit applied the

same analysis to retaliation claims under the ADEA.").   The court will address the

claims of harassment and retaliation separately.

1.     Harassment / Hostile Work Environment

Farina appears to allege that, as a result of filing CHRO complaints and a federal

lawsuit, she was subject to a hostile work environment on account of her age.  See

Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 240 (2d Cir. 2007) ("Although the

complaint does not explicitly allege discrimination based on a hostile  work

environment, the complaint alleges "continued harassment" . . . from which we may

infer pleading of hostile work environment claims.").   "The determination of hostility

depends on whether a reasonable person would find the work environment to be hostile

and whether plaintiffs subjectively perceived it to be so."  Id.; see also Ferraro v.

Kellwood Co., 440 F.3d 96, 100 (2d Cir. 2006) (noting that a claim for hostile work

environment requires the plaintiff to show discriminatory conduct that was "sufficiently

severe or pervasive to alter the conditions of [her] employment and create an abusive

working environment").  In addition, because Count Two is brought under the guise of

the ADEA, Farina must also demonstrate that she was subjected to the hostility on

account of her age.  See Kassner, 496 F.3d at 241 ("A plaintiff must also demonstrate

that she was subjected to the hostility because of her membership in a protected class."

(internal quotation marks and citation omitted)).

As in its discussion of Count One, the court concludes that Farina has presented no evidence on which a reasonable jury could find that the defendants subjected her to a hostile work environment due to her age. Farina's Memorandum in Opposition includes a subsection entitled "The Harassment by Defendants was Directly Due to Plaintiff's Age and Disability," but that subsection mentions no evidence that might reasonably give rise to an inference of harassment on the basis of age. See Mem. in Opp. at 32. While Farina alleges she suffered harassment on account of her age, the Second Circuit has repeatedly held that "unsupported allegations do not create a material issue of fact." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). Therefore, assuming Farina has intended to bring a claim for hostile work environment on the basis of her age, summary judgment is granted to the defendants on that claim.

 2. Retaliation

"The ADEA prohibits an employer from discriminating against an individual employee because of the individual's opposing any practice made unlawful under the statute." Kasser, 496 F.3d at 241 (citing 29 U.S.C. § 623(d)). While it is far from clear, it appears that Farina alleges that she was retaliated against because she filed CHRO complaints in 2008 and 2009 that mentioned age discrimination. See Pl.'s Exh. 26 at ¶ 93; Defs.' Exh. 101 at ¶ 37. The court applies the McDonnell Douglas burden-shifting analysis to Farina's ADEA retaliation claim. See Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003).

 a. Prima Facie Case

To establish a prima facie case of retaliation in violation of the ADEA, a plaintiff must show that "(1) the plaintiff was engaged in an activity protected under the ADEA;

(2) the employer was aware of the plaintiff's participation in the protected activity; (3) the plaintiff was subject to an adverse employment action; and (4) there is a nexus between the protected activity and the adverse action taken." Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997).

"The plaintiff's burden at this stage is slight—he may establish a prima facie case with de minimis evidence." Id. However, the court concludes that Farina has not met that burden.[24] While the defendants appear to concede that Farina has satisfied the first, second, and third elements of the prima facie case, Mem. in Supp. at 32-33, the fourth element is not satisfied for three reasons. First, Farina's Memorandum in Opposition asserts that, "[o]n the same day that Buono received notice of Plaintiff filing her CHRO complaint, a protected activity, he recommended plaintiff for termination." Mem. in Opp. at 35. However, the evidence Farina cites does not support that argument. The letter written by Buono to which Farina refers is dated April 14, 2008. Pl.'s Exh. 23. Farina filed her CHRO complaint in May. L.R. 56(a)(1) Stmt. at ¶ 56 (stating that Farina filed her first complaint with the CHRO on May 16, 2008); L.R. 56(a)(2) Stmt. at ¶ 56 (admitting L.R. 56(a)(1) Stmt. at ¶ 56). Given that Farina points to Buono's letter in support of her claim that there existed a factual nexus between her protected activity and her termination, and that such letter was written before that protected activity took place, the court concludes that Farina has failed to show a factual nexus, for purposes of her prima facie case.

Second, while Farina appears to rely on the temporal proximity between her

---

[24] Interestingly, the subsection of Farina's Memorandum in Opposition that discusses whether she has established a prima facie case of retaliation never expressly mentions the ADEA retaliation claim.

CHRO complaint and her termination—in showing that there existed a nexus between her protected activity and the adverse action taken against her[25]—the court concludes that the temporal proximity was not close.  See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (internal quotation marks and citation omitted)).  However, roughly seven months lapsed between the filing of her first CHRO complaint and her termination, and "[c]laims of retaliation are routinely dismissed when as few as three months elapse between the protected . . . activity and the alleged act of retaliation."  Nicastro v. Runyon, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) (collecting cases).  The court concludes that the temporal connection on which Farina relies is tenuous at best.

Third, the Second Circuit has held that, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001).  Here, as noted in section III, supra, complaints and negative performance reviews suggesting Farina's tardiness and poor teaching performance arose well before her protected activity in 2008.  Indeed, such issues, as noted above, were first raised during the 2003-2004 school year.

---

[25] That is, at least to the extent that the adverse employment action Farina alleges was her termination from employment.

b.    Pretext

Even if the court were to conclude that Farina has proven a <u>prima facie</u> case of

ADEA retaliation, she has not offered any evidence suggesting that the defendants'

legitimate, nondiscriminatory reasons for the adverse employment actions taken against

her—namely her chronic tardiness and consistently subpar performance reviews, <u>see</u>

<u>supra</u> section III—were pretextual.  Farina has simply not pointed the court to any

evidence that the defendants held retaliatory animus due to Farina's protected action

under the ADEA.

C.    <u>Count Three: ADA Disability Discrimination</u>

Count Three of the Amended Complaint alleges disability discrimination, in

violation of the ADA, a federal statute that provides, <u>inter alia</u>, that "[n]o covered entity

shall discriminate against a qualified individual on the basis of disability in regard to job

application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment."

<u>See</u> 42 U.S.C. § 12112(a).  "Claims alleging disability discrimination in violation of the

ADA are subject to the burden-shifting analysis originally established by the Supreme

Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)."  <u>McBride v. BIC</u>

<u>Consumer Prods. Mfg. Co.</u>, 583 F.3d 92, 96 (2d Cir. 2009); <u>see</u> <u>supra</u> section IV.A

(describing burden-shifting framework).

1.    <u>Prima Facie</u> Case

The defendants argue that summary judgment must be granted on Count Three

because Farina cannot establish a <u>prima facie</u> case under 42 U.S.C. § 12112(a).  To

establish such a case, Farina must show that "(1) [her] employer is subject to the ADA;

(2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of [her] disability." Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001). There is no dispute that the Board is subject to the ADA, or that Farina suffered an adverse employment action.

    a.  Whether Farina Was "Disabled"

   The court first considers whether Farina was disabled within the meaning of the ADA. The ADA defines "disability" as either:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

> (B) a record of such an impairment; or

> (C) being regarded as having such an impairment.

See 42 U.S.C. § 12102(1). Farina's Memorandum in Opposition argues that she is disabled in two ways: first, because she has back problems caused by surgeries that took place in 1988 and 1994; and second, because she suffers from insomnia and fatigue, which are linked to her thyroid disorder and thyroid cancer. Mem. in Opp. at 12-13. The defendants argue that neither Farina's back problems nor her insomnia and fatigue are disabilities under the meaning of the ADA. The court's analysis proceeds using the "three-step approach taken by the Supreme Court in Bragdon v. Abbott, 524 U.S. 624 (1998)." Weixel v. Bd. of Educ., 287 F.3d 138, 147 (2d Cir. 2002). Under this approach, "plaintiff must first show that she suffers from a physical or mental impairment; . . . [s]econd, plaintiff must identify the activity claimed to be impaired and

establish that it constitutes a major life activity; and . . . [t]hird, the plaintiff must show that her impairment "substantially limits" the major life activity previously identified. Id.

    i. <u>Farina's back problems</u>. Farina's back problems were allegedly caused by surgeries for herniated and ruptured discs that took place in 1988 and 1994. Farina Dep. at 14:5-10. Farina testified that, following her surgeries, her doctor gave her a fifteen- to twenty-pound lifting restriction. Id. at 16:4-17:8. Farina's deposition testimony is somewhat unclear as to whether such lifting restrictions were in place during the relevant times underlying this lawsuit. Id. Nevertheless, a reasonable jury could find that Farina's back problems did constitute a physical impairment. Similarly, the life activities upon which Farina relies—standing, walking, and lifting, Mem. in Opp. at 12—clearly constitute major life activities under the ADA. See 29 C.F.R. § 1630.2(i) (defining walking as a major life activity); Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 870 (2d Cir. 1998) (holding that standing and lifting are major life activities).

    However, the court concludes that no reasonable jury could find, based on the evidence in the record, that Farina's back problems "substantially limited" her major life activities of walking, standing, and lifting. The term "substantially limited" means

    (i) Unable to perform a major life activity that the average person in the general population can perform; or

    (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). In determining whether Farina was substantially limited in her ability to walk, stand, and lift, the court considers:

    (i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).

In support of her argument that her back injuries substantially limited her ability to walk, stand, and lift, Farina asserts that she is "unable to stand for moderate periods of time or walk even moderate distances due to her back injuries." Mem. in Opp. at 12. However, there is no evidence in the record to support this conclusory assertion. While the record does show that Farina underwent back surgery in 1988 and 1994, Farina points to only one statement indicating the extent of the resulting restrictions on her ability to stand and walk. In her deposition, when asked whether she "ha[d] any other adverse effects in any of [her] major life activities from [her] back," Farina responded "[b]asically, you know, just using common sense not lifting, sitting too long, standing too long."[26] Farina Dep. at 43:17-20. This statement, which provides essentially no information as to the extent of Farina's (in)ability to walk and stand, is not enough on which a reasonable jury could find that Farina's back problems "substantially limits" her ability to walk or stand. 28 U.S.C. § 12102(1)(A).

Similarly, to the extent Farina argues that her ability to lift was severely restricted, the court disagrees. Multiple district courts within the Second Circuit have held, "the inability to lift in excess of ten pounds . . . , as compared to the abilities of the average person in the population, [is] not [a] substantial limitation[] on major life activities within

---

[26] Farina'a Affidavit does not mention her inability to stand, walk, or lift. See Farina Aff.

the meaning of the ADA. Glozman v. Retail, Wholesale & Chain Store Food Emps. Union, Local 338, 204 F. Supp. 2d 615, 621 (S.D.N.Y. 2002); see also Colwell v. Suffolk Cnty. Police Dep't, 158 F.3d 635, 644 (2d Cir. 1998) (holding that an individual police officer was not "substantially limited" when he was able to lift "light objects," but not "very heavy objects"). However, in light of recent amendments to the ADA—lowering the threshold requirement to establish a "disability" and including "lifting" as a "major life activity," see 42 U.S.C. § 12102(2)(A); see generally ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (codified in scattered sections of U.S.C.)—it is possible that even a relatively minor lifting restriction could qualify as a disability within the statute.[27]

The court in the instant case does not need to determine whether Farina's restrictions on lifting immediately following her surgery constituted a disability, as Farina has failed to produce evidence that those restrictions continued to affect her during the relevant period of time. Her back surgeries both took place more than fifteen years ago, and the only evidence indicating that she still had such lifting restriction at the time of the events underlying this case is a statement she wrote in an email to Buono and others. The statement reads, "After having 2 back surgeries, I really do think you expect me to move furniture, desks, file cabinets again as I did do this summer and many days left here and could not move." Pl.'s Exh. 42. This statement, in the court's view, is insufficient to establish any recent lifting restrictions.

---

[27] The court notes that the ADA Amendments Act do not apply retroactively. See Young v. Precision Metal Prods., Inc., 599 F. Supp. 2d 216, 223-24 (D. Conn. 2009). However, much of the relevant conduct in this case (including Farina's termination) took place after the Act became effective in January 2009.

ii. Farina's insomnia and fatigue.  The court now turns to whether Farina's

insomnia and fatigue, which were apparently caused and/or exacerbated by her thyroid

cancer and thyroid disease, constitute a disability within the meaning of the ADA.

Farina alleges that her disabilities in this area affect the major life activity of sleeping.

The court determines that Farina has raised a triable issue of fact as to whether she

suffered from thyroid cancer, thyroid disease, and insomnia.[28]  See, e.g., Farina Dep. at

11:1-17; 12:1-14.  Further, as the Second Circuit has held, sleeping is "undoubtedly a

major life activity."  Colwell, 158 F.3d at 643.

However, the court concludes that Farina has raised no triable issue that she is

"substantially limited" in her ability to sleep.  Farina testified in her deposition that she

has trouble sleeping "[p]robably almost nightly," Farina Dep. at 21:1, later clarifying that

her sleep patterns "vary," id. at 25:15; 26:11-18.  While Farina's Affidavit clarifies that

she "regularly" sleeps only two hours per night, Farina Aff. at ¶ 12, the defendants

argue that the court should disregard that Affidavit, because it represents an attempt to

manufacture a factual issue by submitting a deposition that contradicts prior deposition

testimony, see Reply at 5; see also Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 620

(2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in

opposition to a summary judgment motion that, by omission or addition, contradicts the

---

[28] To the extent Farina argues that fatigue constitutes a disability, that argument is rejected.
Farina has not cited any cases indicating that fatigue is an ADA-protected disability, and the court has
found none.  See Hinton v. City Coll. of N.Y., No. 05 Civ. 8951, 2008 WL 591802, at *21 (S.D.N.Y. Feb.
29, 2008) ("Nevertheless, it is noteworthy that Hinton has not cited, nor has the Court found, any case
where a federal court has held that . . . chronic fatigue syndrome is a disability within the meaning of the
ADA."); cf. Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 n.2 (9th Cir.1996) ("assum[ing], without finding,
that . . . Chronic Fatigue Syndrome is a 'disability'" within the meaning of the ADA, but denying plaintiff's
claim).

affiant's previous deposition testimony. . . .  [F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."); Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969). ("[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").  The court is not entirely persuaded by this argument, as Farina's Affidavit clarifies, but does not directly contradict, her deposition testimony.  See, e.g., Susko v. Romano's Macaroni Grill, 142 F. Supp. 2d 333, 337 (E.D.N.Y. 2001) ("In this case, Susko's affidavit is not used to create a factual dispute where no issue of fact previously existed.  It merely clarifies the deposition testimony . . .").

Nevertheless, "[c]ourts in the Second Circuit have consistently held that when a plaintiff fails to offer any medical evidence substantiating the specific limitations to which [s]he claims [s]he is subject due to [her] condition, [s]he cannot establish that [s]he is disabled within the meaning of the ADA." Baerga v. Hosp. for Special Surgery, No. 97 Civ. 0230, 2003 WL 22251294, at *6 (S.D.N.Y. Sept. 30, 2003) (collecting cases and holding that "Plaintiff's own self-serving descriptions of sleeping difficulties do not, by themselves, demonstrate an impairment that substantially limits the major life activity of sleep").  In this case, while Farina offers deposition testimony from Dr. Adam Mayerson indicating that another doctor[29] "arranged for a sleep study" to be performed on Farina, Dep. of Adam Mayerson at 21:3-13, the record contains no medical evidence

―――――――――――――――

[29] While this other (unnamed) doctor apparently treats insomnia, Dr. Mayerson does not.  Dep. of Adam Mayerson at 33:20.

substantiating the specific limitations which Farina claims she suffers due to her insomnia. Cf. Baerga, 2003 WL 22251294, at *6 n.7 ("[W]here courts have found that plaintiffs made a sufficient showing of substantial limitation of their ability to sleep, the plaintiffs supported their allegations with documented medical evidence.") (collecting cases). Moreover, Farina has presented no evidence that her trouble sleeping "is any worse than is suffered by a large portion of the nation's adult population."[30] Colwell, 158 F.3d at 644.

     iii. Summary. The Second Circuit has stated that satisfying the ADA's statutory definition of a disability constitutes a "significant threshold for seeking redress under the ADA." Felix v. N.Y.C. Transit Auth., 324 F.3d 102, 107 (2d Cir. 2003). In this case, Farina cannot establish that she was "disabled" within the meaning of the ADA, because she has presented no evidence that she was "substantially limited" in her ability to walk, stand, lift, or sleep. On this basis, the court grants the Motion for Summary Judgment as to Count Three of the Amended Complaint.

     b.     Pretext[31]

     Even if this court were to conclude that Farina could satisfy the elements of a prima facie case of ADA discrimination, Farina has not presented evidence on which a reasonable jury could find that the defendants' proffered nondiscriminatory reason for

---

[30] While Farina urges the court to take notice of various studies cited in other district court cases, none of those studies are in evidence here. See Mem. in Opp. at 16. It would be inappropriate for the court to rely on judicial summaries of purportedly scientific reports, for the purpose of analyzing whether Farina has shown a "substantial limitation" on her ability to sleep. Farina has disclosed no expert on the subject.

[31] Because the court has concluded that Farina cannot establish that she was "disabled" within the meaning of the ADA, the court will not address the question of whether she was "otherwise qualified to perform the essential functions of [her] job."

terminating her employment—i.e., her habitual tardiness and consistently poor performance reviews, see supra section III—was pretextual.  Farina argues that the defendants' decision to fire her was a pretext for disability discrimination because they never placed her in an "intensive improvement plan," at the conclusion of which they (presumably) would have been allowed to fire her.  Mem. in Opp. at 29.  The court is unpersuaded.

First and most importantly, the record clearly shows that Farina was placed into a variety of teacher improvement programs, even before the date on which she allegedly informed Buono that she was disabled.[32]  Indeed, as stated in this court's discussion of the facts, Farina first received a negative performance review as early as 2004.  Farina Dep. at 29:19-21.   While Farina claims that this court should discount this 2004 performance review because it was based on "hearsay" taken from "aides in [Farina's] classroom," Farina Dep. at 29:25-30:3, the issue for the court is not whether such negative performance review was accurate, per se, but whether there is any indication that such negative performance review was a pretext for disability discrimination.  The fact that Farina received such negative criticism well before the defendants had any idea Farina claimed a disability, indicates that the Board's criticism of her teaching was not plausibly motivated by disability-related animus, at least before May 2007.  See supra section III.

In addition, whether or not Farina was ever placed in an "intensive improvement plan," she has offered no evidence linking such placement (or lack thereof) with the fact

---

[32] That date, Farina asserts, was in May 2007.  See Mem. in Opp. at 35.

that she had a disability. In other words, even if the Board knowingly failed to place Farina in an "intensive improvement plan," this evidence, without more, simply would not be enough of a basis on which a reasonable jury could find the Board liable for disability discrimination. Perhaps more importantly, to the extent Farina argues that the improvement programs in which she was placed were not "intensive" enough, Farina has cited no evidence to support that allegation. See Defs.' Exh. 6 at 11 (describing TIPP process).

Third, the defendants have submitted evidence, consisting of a performance review from evaluator Dr. Tony Rigazio-DiGilio and an essay written by John Cain (a former student teacher in Farina's class), corroborating many of the same criticisms offered by Buono and other evaluators. See Defs.' Exhs. 85, 86. There is no evidence in the record indicating that either Dr. Rigazio-DiGilio or Cain had any knowledge of Farina's alleged "disabilities" in this case. However, they both observed, inter alia, an "absence of a focus on learning" in Farina's classroom, and the fact that Farina "rarely" checked to see if her students understood the material they were being taught. See Defs.' Exh. 85 (summative evaluation at page Def.000459); Defs.' Exh. 86.

In sum, the court concludes that Farina has not made a sufficient showing to establish the existence of pretext. The Board is therefore entitled to summary judgment on Count Two as a matter of law. See Beard v. Banks, 548 U.S. 521, 529 (2006) ("Rule 56 mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (internal quotation marks and citation omitted)).

29

D.    Count Four: Failure to Accommodate

Count Four of the Amended Complaint alleges that the defendants failed to accommodate Farina's disabilities.  Indeed, "[d]iscrimination in violation of the ADA includes, inter alia, 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'"  McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A)).  An "otherwise qualified" individual is someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

To establish a prima facie claim for disability discrimination arising from a failure to accommodate, a plaintiff must show each of the following:

> (1) [P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

McBride, 583 F.3d at 97 (internal quotation marks and citations omitted).  For the reasons noted by the court in its discussion of Count Three, the record contains no evidence on which a reasonable jury could find that Farina was disabled, within the meaning of the ADA.

Moreover, to the extent Farina requested an accommodation to come late to school, that accommodation is not reasonable.  Farina's Affidavit indicates that she has "extreme difficulty waking up in the mornings," and "experience[s] severe fatigue throughout the day."  Farina Aff. at ¶¶ 13, 16.  In 2008, Farina asked for—and was granted—permission to arrive at school by 8:20 a.m.  See Farina Dep. at 49:8-12.

However, she remained unable to come to work by that time.  See id. at 48:5-9.  Now,

Farina has simply provided no evidence as to why an extra ten minutes in the morning

(that is, a change to her start time from 8:20 a.m. to 8:30 a.m.) would accommodate

these issues.[33]  In fact, during his deposition, Mayerson agreed that such an

accommodation would not "do anything as far as [Farina's] fatigue or insomnia."

Mayerson Dep. at 34:15-19.  Given that the defendants have provided evidence that

Farina's proposed accommodation was not related to her alleged medical condition,

and Farina has presented nothing to the contrary, that accommodation was not

reasonable.

     E.     Count Five: ADA Harassment and Retaliation

Count Five of the Amended Complaint alleges that Farina suffered

"discrimination, severe retaliation and harassment," in violation of the ADA.  Third Am.

Compl. at ¶ 189.  The court will address the claims of harassment and retaliation

separately.

     1.     Harassment / Hostile Work Environment

Farina appears to allege that, as a result of requests for reasonable

accommodations and other protected activity, she was subject to a hostile work

---

[33] Moreover, to the extent Farina argues that she should be granted an accommodation permitting her to arrive to school after 8:30 a.m. (the time at which students began coming into class), the court disagrees.  "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1).  As Farina clearly and unambiguously conceded in her deposition, arriving to work by the time the students arrived was very important, because teachers are tasked with "taking care of children, making sure their curriculum is taught, [and] being responsible for the education and safety of the children."  Id. at 52:10-53:4; see also Collective Bargaining Agreement art. III.A, Defs.' Exh. 36 ("Pupils will be supervised during the regular school day and at all school functions to which the teacher may be assigned.").  The court concludes that arrival to school by 8:30 a.m. at the latest was clearly an essential function of position.  The court does not reach the question of whether arriving before that time was an essential function.

environment on account of her disabilities.  See Kassner v. 2nd Ave. Delicatessen Inc.,
496 F.3d 229, 240 (2d Cir. 2007) ("Although the complaint does not explicitly allege
discrimination based on a hostile  work environment, the complaint alleges 'continued
harassment' . . . from which we may infer pleading of hostile work environment
claims.").  "The determination of hostility depends on whether a reasonable person
would find the work environment to be hostile and whether plaintiffs subjectively
perceived it to be so."  Id.; see also Ferraro, 440 F.3d at 100.

Notably, "[t]he Second Circuit has yet to determine whether the ADA gives rise to
a cause of action for hostile work environments."  Bonura v. Sears Roebuck & Co., 62
F. App'x 399, 400 n.3 (2d Cir. 2004); see also Ragusa v. Malverne Union Free Sch.
Dist., No. 08-5367-cv, 2010 WL 2490966, at *2 n.3 (2d Cir. June 21, 2010) ("Assuming
arguendo that Ragusa's putative hostile work environment claim is properly before us,
and without deciding whether such a claim is available under the ADA . . . .").  However,
certain district courts within the Second Circuit recognize such a cause of action,
Monterroso v. Sullivan & Cromwell, LLP, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008),
and "the circuits that have reached this question have answered it in the affirmative."
Bonura, 62 F. App'x at 400 n.3.  In any case, even assuming Farina can bring an ADA
claim for hostile work environment, that claim must be denied on the grounds that she
has not provided evidence on which a reasonable juror could find that she was
disabled, within the meaning of the ADA.  See supra section IV.C.1.a; see also, e.g.,
Raguso,  2010 WL 2490966, at *2 n.3 (noting that "Ragusa's failure to demonstrate that
she is a qualified individual would defeat any such claim") (citing Kassner, 496 F.3d at
241 ("A plaintiff must also demonstrate that she was subjected to the hostility because

of her membership in a protected class.")); <u>Fox v. Gen. Motors Corp.</u>, 247 F.3d 169,

177 (4th Cir. 2001) ("[A]n ADA plaintiff must prove the following to establish a hostile

work environment claim: (1) he is a qualified individual with a disability . . . .") (cited in

<u>Bonura</u>, 62 F. App'x at 400 n.3).

        2.     Retaliation

The ADA provides that "[n]o person shall discriminate against any individual

because such individual has opposed any act or practice made unlawful by this chapter

or because such individual made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. §

12203(a). ADA retaliation claims are analyzed using the <u>McDonnell Douglas</u> burden-

shifting analysis. <u>See</u> <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 719 (2d Cir. 2002).

        a.     <u>Prima Face</u> Case

To establish a <u>prima facie</u> case of ADA retaliation, Farina must show that "(1)

[s]he engaged in an activity protected by the ADA; (2) the employer was aware of this

activity; (3) the employer took adverse employment action against [her]; and (4) a

causal connection exists between the alleged adverse action and the protected activity."

<u>Id.</u>

As with the claim of ADEA retaliation, the court concludes that Farina cannot

satisfy the "causal connection" element of the <u>prima facie</u> case. The Second Circuit

has held that,

> proof of causation can be shown either: (1) indirectly, by showing that the
> protected activity was followed closely by discriminatory treatment, or through
> other circumstantial evidence such as disparate treatment of fellow employees
> who engaged in similar conduct; or (2) directly, through evidence of retaliatory
> animus directed against the plaintiff by the defendant.

33

Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000). Here, Farina has no direct evidence that indicates retaliatory animus on the part of the defendants. Therefore, the court must determine whether Farina's circumstantial evidence would be enough on which a reasonable juror could find a causal connection between the alleged adverse actions and the protected activity in which she engaged.

   i. Evidence of Disparate Treatment of Fellow Employees Who Engaged in Similar Conduct. Farina appears to try to prove causation in part by showing that she was treated differently from fellow employees once she engaged in protected action. Indeed, her Affidavit states that she "was the only teacher who was required to sign in daily, even though other teachers would arrive at the same time as [her]." Farina Aff. at ¶ 21. Farina's Affidavit also states that "[o]ther teachers arrive later than 8:15 regularly, and some arrive after 8:30." Id. at ¶ 22. This evidence, in the court's view, is unhelpful. While Farina asserts that she was treated differently from other teachers who engaged in similar behavior, the record contains no evidence of who those other teachers were, and whether they did, in fact, engage in a pattern of tardiness to school. No reasonable jury could find, based on Farina's conclusory allegations, that she has shown that she was treated differently from "fellow employees who engaged in similar conduct."[34]

---

[34] The decision of Henrietta D. v. Bloomberg, 331 F.3d 261 (2d Cir. 2003), is not to the contrary. There, the Second Circuit held that the "'concept of discrimination' embraced by the ADA [does not] demand[] that plaintiffs identify a 'comparison class' of "'similarly situated individuals given preferential treatment.'" Id. at 273. Henrietta D., however, was not decided in the context of an ADA retaliation claim. Indeed, in the court's view, if a plaintiff attempts to show causation, as part of an ADA retaliation cause of action, by demonstrating the existence of fellow employees who engaged in similar conduct, that plaintiff must do more than simply assert that such (unnamed) fellow employees existed. See Ruiz v. County of Rockland, 609 F.3d 486, 494 (2d Cir. 2010) (holding that a comparator must be similarly situated in "all material respects"); see also, e.g., Christy v. Ken's Beverages, Inc., 660 F. Supp. 2d 267, 274 (D. Conn. 2009) (finding that incomplete information about unnamed fellow employees could not support inference of discrimination). While Farina may, of course, prove discriminatory intent in ways other than by comparing herself to fellow employees, merely stating that she was treated differently from other

<u>Gordon</u>, 232 F.3d at 117.

     ii.  <u>Temporal proximity.</u>  Farina also appears to try to prove causation by showing the close temporal proximity between her protected activities and the adverse actions taken against her.  <u>See</u> <u>Lovejoy-Wilson</u>, 263 F.3d at 224 ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (internal quotation marks and citation omitted)).  At the outset, the court notes that it is extremely unsure as to what adverse actions Farina is alleging.  Farina's Memorandum in Opposition states that "all the incidents" following her disclosure to Buono of her disability on May 2007 "should be considered . . . adverse employment actions."  Mem. in Opp. at 35. The court is unsure as to what "incidents" Farina is referring.  In any case, Buono did not suggest terminating Farina until April 2008, <u>see</u> Pl.'s Exh. 23, Farina's one-day suspension took place in September 2008, <u>see</u> Defs.' Exh. 63, and Farina was not finally terminated until November 2009.  The only arguably adverse actions the defendants appear to have taken against Farina immediately following May 2007, were negative performance reviews.[35]  However, in <u>Burlington N. & Santa Fe Ry. v. White</u>, 548 U.S. 53 (2006), the Supreme Court held that "material adversity" is "important to separate significant from trivial harms."  <u>Id.</u>  Consequently, the Second Circuit has held that, "where the employer merely enforces its preexisting disciplinary policies in a reasonable manner," no adverse employment action has occurred for ADA purposes.

---

employees, without more, does not support an inference that defendants acted with retaliatory animus.

    [35] Neither Farina's Memorandum in Opposition nor her Amended Complaint suggests that her transfer to the second grade constitutes an adverse employment action.

See Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006); see also Brown v. Brody, 199 F.3d 446, 458 (D.C. Cir. 1999) ("[A] . . . thick body of precedent . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions."); Byra-Grzegorczyk v. Bristol-Myers Squibb Co., 572 F. Supp. 2d 233, 252 (D. Conn. 2008) ("Negative performance reviews in particular are generally not considered actionable forms of retaliation." (internal quotation marks and citation omitted)). While "sometimes negative performance reviews can be considered a part of an adverse action if the negative review leads to a plaintiff's demotion or termination," Byra-Grzegorczyk, 572 F. Supp. at 252 (citation omitted), here Farina began receiving such reviews more than five years before her employment was terminated and more than three years before any allegedly protected activity took place.

Farina also suggests that Buono retaliated against her for filing her first CHRO complaint in early May 2008, by recommending her termination. See Mem. in Opp. at 35. However, as discussed above, the only evidence Farina cites in support of this argument is Buono's April 14, 2008 letter to Farina. See Pl.'s Exh. 23. Because that letter is dated several weeks before Farina's initial CHRO complaint, the court concludes that it cannot give rise to an inference that it was an act of retaliation for filing that complaint.

Farina additionally alleges that the defendants retaliated against her for filing her second CHRO complaint by placing her on a fourth TIPP shortly after it was filed. While the court agrees that temporal proximity at issue here is very close, it concludes that that the placement of Farina on a fourth TIPP does not, as a matter of law, constitute an adverse employment action. There is no evidence in the record that

placement in a TIPP constitutes a "materially adverse change in the terms and conditions" of a teacher's employment. <u>Sanders v. N.Y.C. Human Res. Admin.</u>, 361 F.3d 749, 755 (2d Cir. 2004) (Title VII context). Rather, the record shows that TIPPs are designed to <u>improve</u> teaching performance by providing teachers with, among other things, instructional aides. <u>See, e.g.</u>, Pl.'s Exh. 75. More generally, the Second Circuit has held that, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." <u>Slattery v. Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87, 95 (2d Cir. 2001). Here, as noted <u>supra</u> at 3-7, complaints about Farina's tardiness and poor teaching performance arose well before her protected activity began and as early as 2004. Further, she was placed in TIPP programs as early as 2007, and in the "summative cluster" as early as 2004. The fact that she happened to be placed in a new TIPP shortly after filing a second CHRO complaint is insufficient for a jury to infer retaliatory animus.

      b.    Pretext

Even if the court were to conclude that Farina had proven a <u>prima facie</u> case of ADA retaliation, she has not offered any evidence suggesting that the defendants' legitimate, nondiscriminatory reasons for the adverse employment actions taken against her—namely, her chronic tardiness and consistently subpar performance reviews, <u>see supra</u> section III—were pretextual. As the court has noted, <u>see</u> <u>supra</u> at 3-4, Farina received poor performance reviews as early as 2004. Moreover, as discussed above, <u>see</u> <u>supra</u> at 29, the record contains statements written by individuals with no apparent knowledge of Farina's disability, that echo many of the same criticisms offered by

Buono and other evaluators who apparently knew that Farina considered herself to be disabled.  <u>See</u> Defs.' Exhs. 85, 86.

Given that Farina has not created a material issue of fact on pretext, the Board is entitled to summary judgment as a matter of law on the ADA retaliation claim.  <u>See</u> <u>Beard</u>, 548 U.S. at 529 (2006) ("Rule 56 mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (internal quotation marks and citation omitted)).

F.    <u>Count Eleven: ADA Retaliation / Mental Disability</u>

In Count Eleven, Farina appears to allege that the Board discriminated against her because it regarded her as having a perceived mental disability, and also retaliated against her.  <u>See</u> Third Am. Compl. at ¶ 262.  This claim centers on the events of June 3, 2008, on which date Farina was taken to the hospital after making a comment that may have been interpreted as suicidal.  <u>See</u> <u>supra</u> section III.  The court is unsure as to the nature of this claim.  It is labeled in the Amended Complaint as ADA retaliation, but Farina appears to argue that it is, in fact, a claim of discrimination, in violation of the ADA.  The court will therefore analyze Count Eleven under both standards.

1.    Retaliation

To establish a <u>prima facie</u> case of ADA retaliation, Farina must show that "(1) [s]he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [her]; and (4) a causal connection exists between the alleged adverse action and the protected activity." <u>Treglia</u>, 313 F.3d at 719.

The court concludes that Farina cannot satisfy either the first or the third element of the prima facie case. First, the record contains no evidence, nor does the Memorandum in Opposition argue, that Farina engaged in any protected activity in connection with the events of June 3, 2008. Second, Farina does not appear to argue that she suffered any adverse employment actions as a result of such events. See infra section IV.E.2; Mem. in Opp. at 30.

### 2. Discrimination / Mental Disability

As earlier noted, to establish a prima facie case of employment discrimination, Farina must show that "(1) [her] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of [her] disability." Giordano, 274 F.3d at 747. A claim of discrimination under the ADA may also arise when a plaintiff is "regarded as" disabled, within the meaning of the ADA.[36] 42 U.S.C. §§ 12102(1)(C), 12112(a); see, e.g., Mastrolillo v. Connecticut, 352 F. App'x 472, 474 (2d Cir. 2009).

The Memorandum in Opposition argues that the defendants discriminated against Farina, on account of her perceived mental disability, when they forced her to submit to a second fitness for duty evaluation after her release from Yale New Haven Hospital (presumably because Halligan did not trust the fact that the doctors at that

---

[36] A 2008 amendment to the ADA altered the standard for "being regarded as" disabled, removing the requirement that the employer perceive the disability as a limitation on a major life activity. See 42 U.S.C. § 12102(3)(A). However, the new standard does not affect this decision, because Farina cannot establish a material adverse change in her employment.

hospital had released her to work).[37]  See Mem. in Opp. at 30.  Indeed, the record is

clear that, after Farina was released from the hospital and cleared to go back to work,

Halligan wrote a letter to her doctor stating that the doctor's "assessment in giving Ms.

Farina a clean bill of health to return to her classroom is contra-indicated in light of her

recent behavior."  Pl.'s Exh. 38.  Halligan also wrote a memorandum to Farina after her

release from the hospital, indicating that another psychological/psychiatric evaluation

would be necessary before her return to work.  Defs.' Exh. 23.

While the record is clear, the fact that Halligan forced Farina to take a second

fitness for duty evaluation is not evidence of an adverse employment action.  As stated

above, an adverse employment action, for purposes of proving an ADA prima facie

case, is a "materially adverse change in the terms and conditions" of employment.

Sanders, 361 F.3d at 756.  Here, Farina has cited no cases, and the court can find

none, indicating that being forced to submit to a fitness for duty evaluation might

constitute an adverse employment action.  For these reasons, the court concludes that

no reasonable jury could find that Farina has shown that being forced to submit to a

second fitness for duty examination resulted in a materially adverse change in the terms

and conditions of her employment.  Farina thus fails to satisfy the fourth element of a

prima facie case, and summary judgment is granted to the defendants on Count

Eleven.

---

[37] Indeed, the Memorandum in Opposition appears to argue that requiring Farina to submit to a second fitness for duty evaluation was the only adverse employment action taken against her due to her perceived disability.  See Mem. in Opp. at 29-30.

G.    Remaining State Claims

Because this court has granted summary judgment to the defendants on all of

Farina's federal claims, it will decline to exercise supplemental jurisdiction over Farina's

remaining state law claims.  See 28 U.S.C. § 1367(c)(3).

## V.    CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment (Doc. No. 57) is

granted.  In light of this Ruling, the court denies Defendants' Motion to Strike (Doc. No.

71) (except that portion regarding length of brief, which has already be granted).  The

Clerk is directed to close this case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 22nd day of September, 2010.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge